Opinion issued
June 14, 2012.



In
The

Court of
Appeals

For
The

First District
of Texas

————————————

NOS.
01-10-01105-CR

          01-10-01106-CR

          01-10-01107-CR

———————————

Larry Adams, Appellant

V.

The
State of Texas, Appellee



 



 

On Appeal from the 10th
District Court

Galveston County, Texas



Trial Court Case Nos. 09CR3830, 09CR3831, & 09CR3832

 



 

 

MEMORANDUM
OPINION

 

          Larry
Adams pleaded not guilty to three charges of aggravated robbery.  See Tex. Penal Code Ann. §
29.03(a)(2) (West 2011).  The jury found him guilty
and assessed his punishment at nine years in prison for one charge and six
years for each of the other two charges. 
On appeal, Adams contends that the evidence is insufficient to support
his conviction under the law of parties. 
We affirm.  

Background

          On
December 19, 2009, Kelly Collins was working as an attendant at the Keno Castle
game room in Bacliff.  The game room was
open only to members, in part, because it was illegally awarding cash prizes.  Both the front and back doors to the game
room were secured such that anyone seeking entry would have to knock or press a
buzzer.  Collins could then check a
camera, and if she knew the person, allow him to enter.  Around 11:30 a.m., a man knocked on the front
door.  Collins did not recognize him, so
she did not let him in.  

          At
about 2:30 p.m., four people were playing in the game room: Terry Robinson,
Raul Guiterrez, Sidney Brummerhop, and Linda Carman.  The back doorbell rang.  Collins checked the camera and saw Adams, who
was a member of the game room and an acquaintance of Robinson.  Collins opened the door for Adams, he entered,
and the two exchanged greetings.  

          The
door was slowly closing behind Adams, but, before it shut completely, a man brandishing
a semiautomatic pistol grabbed the door and burst inside.  Collins testified that this was the same man to
whom she had denied entry earlier that day. 
He was later identified as Michael McFarland.  Collins grabbed McFarland’s arm and forced it
upwards to keep the pistol pointed away from herself and the patrons.  A second man, later identified as Jovan Wesby,
came in, also with a semiautomatic pistol. 
Wesby struck Collins in the head two or three times with the pistol.  She fell to the ground, but continued to
struggle.  Wesby was reaching under Collins’s
shirt, as though he knew she sometimes kept money in her brassiere.  Collins said that, while Wesby assaulted her,
Adams jumped back and forth into the other room a few times and then just stood
there.  When McFarland went into the main
game room, Wesby hauled Collins to her feet and forced her to unlock the
office and open the safe, pushing her to the floor after she had done so.  After emptying the safe and the register, Wesby
ransacked the office, finding an additional stash of cash hidden under the bag
in the trash can.  All told, he took
between $5300 and $5500 from the office.   

          Meanwhile,
McFarland robbed Guiterrez and Brummerhop at gunpoint.  McFarland, yelling, ordered the patrons to
not look at him and to get on the ground. 
All of the patrons followed McFarland’s commands except for Adams who got
on his knees at one point, but then stood back up.  The surveillance video introduced at trial
shows Adams, in response to a gesture from McFarland, checking the drawers of
Collins’s desk, pulling her purse out of a drawer, and placing it on the
desktop.  McFarland took the purse on his
way out.  The surveillance video shows
that, during the robbery, Adams and Robinson were located on one end of the
game room, while Guiterrez, Brummerhop, and Carman were towards the opposite
end.  When he entered the game room, McFarland
rushed straight towards those three, passing but ignoring Robinson and
Adams.  On his way out, McFarland passed
Robinson and Adams, but made no apparent attempt to rob them.  Adams later said, in fact, he was robbed by
McFarland, but claimed that it took place in an area of the game room that was
not recorded by the surveillance camera.   


          When
McFarland and Wesby left, Collins called 911 from her cell phone.    She went
out the front door to try to improve reception, bringing the others with
her.  Deputy Bryant with the Galveston
County Sheriff’s Office happened to be nearby and arrived shortly after Collins
reported the robbery.  As he was taking
initial statements from Collins and the patrons, Adams told him that the
robbers took $270 of Adams’s money as well as his car keys.  Adams also told Bryant that his car had been
stolen.  Bryant reported this information
over his radio, including a description of the car.     

          While Bryant
was taking statements, he could hear the police radio broadcast about the
search for the robbers.  At one point,
Bryant heard that a car matching the description of Adams’s car had been found
two blocks from the game room.  When
officers ran the plates, they confirmed the car was registered to Adams.  Adams asked if he could leave to get his car,
but Bryant asked him to stay.

          Deputy Bryant
became suspicious of Adams for a variety of reasons.  He noticed that Adams behaved differently
from the other victims and witnesses. 
Where they were reserved and still “in shock,” Adams was very talkative.  Adams also repeatedly asked if he could leave
the scene, even before the information about his car came in over the
radio.  And Adams told Bryant that his
keys had been stolen, but nevertheless was continually “fumbling with” some
keys at the scene.  Bryant also found
suspicious the fact that the robbers had entered closely behind Adams, but were
not visible to Collins when she opened the door for Adams. 

          A few minutes
before the robbery, Thomas Larry Adams (no relation to the appellant and whom
we will refer to as Thomas for clarity) was returning to his home two blocks
from the game room after being out of town for a short period.  He noticed that two cars were parked directly
in front of his house.  One was a small
blue compact, and the other was a black medium size sedan.  He observed two men walking from the blue car
to the black one, where a third man sat in the driver’s seat.  They got inside the passenger side of the
black car and drove off.  Thomas did not
get a good look at the driver of the black car. 


          Because there
had been several crimes in his neighborhood, Thomas called Investigator Todd
Collins with the Sheriff’s Office.  He
gave Collins the license plate number of the blue car that remained in front of
his house and asked Collins if there had been any break-ins or other problems
while Thomas was away.  While he was
waiting to hear back from Collins, the black car came “tearing back down” the
street and slammed on the brakes.  The
two men he previously saw getting into the black car got out, jumped in the
blue car, and drove off.  

          Deputy
Galindo was responding to the robbery call when he heard police broadcast over
the radio a description of the blue car, specifying its license number and the
fact that that it was occupied by two black males.  When a car matching that description passed
him heading in the opposite direction, Galindo activated his lights and siren,
made a u-turn, and followed the car.  The
suspects led him on a high-speed chase, during which the passenger threw a bag
of money and a gun out the window.  After
striking two other vehicles, the driver of the blue car lost control and
crashed into a roadside ditch.  Galindo
and other law enforcement personnel arrested the two men.  They were McFarland and Wesby.          

          Investigator
Echols, the lead investigator, had McFarland and Wesby taken back to the game
room.  He spoke with the victims and with
Deputy Bryant and reviewed the surveillance video.  The video of the parking lot behind the game
room showed a black car drive by slowly just before the robbery took place.  A few minutes later, the black car pulled
into the lot and parked.  The video
showed Adams get out of the driver’s seat and two other men get out of the
passenger side, and then showed Adams approach the back door.  Echols decided to detain Adams and Robinson.

          At trial, Adams denied any involvement
in the robbery.  He testified that he
came to the game room looking for Robinson, who had called him earlier that
day.  As he approached the back parking
lot, he said he saw two men whom he did not recognize.  The two men were McFarland and Wesby.  McFarland flagged him down and called Adams
by his nickname, “Wookie.”  McFarland
complimented Adams’s car—a black Impala SS that Adams had just brought to the
Houston area from New Orleans.  By the
way McFarland spoke of the car, Adams knew that McFarland must have known him from
New Orleans.  McFarland asked for a ride
and Adams obliged.  He took them about a block
and then McFarland told Adams that the man he and Wesby were supposed to meet
was not there and asked if Adams would drive them back to their car.  Adams testified that when he parked at the
game room, he assumed the two men were then going to get their own car.  He did not know where they went after that.

          Adams
testified that he tried to help Collins as she struggled with Wesby.  He also said that McFarland struck him on the
head with a pistol.  He told the jury
that, although McFarland held him at gunpoint and ordered him to get down on
the floor, he stood up because he was afraid of being shot in the back of the
head.  He said that McFarland ordered him
to search the desk and he did so because McFarland had a gun.  Adams also explained that he had two sets of
keys.  Because he had just parked his
car, his car keys were in his hand. 
Those were the keys McFarland took, and the keys Deputy Bryant saw him holding
were all his other keys.  Finally, Adams
denied that he had picked up McFarland and Wesby in front of Thomas’s
house.  

          On
cross-examination the State identified discrepancies between Adams’s statement to
investigators and his testimony before the jury.  Adams explained that he had suffered a head
injury in a motorcycle accident and was taking medication for it.  He said it affected his memory, but since he
had been sitting in jail for eleven months for a crime he did not commit, he
had had time to think and remember more details that he did not give in his
statement to investigators.

Discussion

A.      Standard of Review

          This
court reviews legal and factual sufficiency challenges using the same standard
of review.  Ervin v. State, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.]
2010, pet. ref’d).  Under this standard,
evidence is insufficient to support a conviction if considering all record
evidence in the light most favorable to the verdict, a factfinder could not
have rationally found that each essential element of the charged offense was
proven beyond a reasonable doubt.  Gonzalez
v. State, 337 S.W.3d 473,
478 (Tex. App.—Houston [1st Dist.] 2011, pet. ref’d) (citing Jackson v.
Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979)). 
Evidence is insufficient under this standard in four circumstances: (1)
the record contains no evidence probative of an element of the offense; (2) the
record contains a mere “modicum” of evidence probative of an element of the
offense; (3) the evidence conclusively establishes a reasonable doubt; and (4)
the acts alleged do not constitute the criminal offense charged.  Gonzalez, 337 S.W.3d at 479 (citing Jackson, 443 U.S. at 314, 318 & n.11,
320, 99 S. Ct. at 2786, 2789 & n.11). 
If an appellate court finds the evidence insufficient under this
standard, it must reverse the judgment and enter an order of acquittal.  Gonzalez, 337 S.W.3d at 479. 

          An
appellate court “determine[s] whether the necessary inferences are reasonable
based upon the combined and cumulative force of all the evidence when viewed in
the light most favorable to the verdict.” 
Clayton v. State,
235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting Hooper v. State, 214 S.W.3d 9, 16–17 (Tex. Crim.
App. 2007)).  When the record supports
conflicting inferences, an appellate court presumes that the factfinder
resolved the conflicts in favor of the verdict and defers to that
resolution.  Id. (citing Jackson, 443 U.S. at 326, 99 S. Ct. at
2793).  An appellate court likewise
defers to the factfinder’s evaluation of the credibility of the evidence and
the weight to give the evidence.  Gonzalez, 337 S.W.3d at 479 (citing Williams
v. State, 235 S.W.3d 742,
750 (Tex. Crim. App. 2007)).

B.      Law Pertaining to Aggravated Robbery

          A
person commits aggravated robbery when the person commits robbery and uses or
exhibits a deadly weapon.  See Tex. Penal Code Ann. § 29.03(a)(2).  A person commits robbery if, in the course of
committing theft, and with intent to obtain or maintain control of property, the
person intentionally or knowingly places another in fear of imminent bodily
injury or death.  Tex. Penal Code Ann. § 29.02(a) (West 2011).  Theft is the unlawful appropriation of
property with the intent to deprive the owner of the property.  Tex.
Penal Code Ann. § 31.03(a) (West Supp. 2011).  A firearm is considered a deadly weapon.  See Tex.
Penal Code Ann. § 1.07(a)(17)(A) (West Supp. 2011).

C.      The Law of Parties

          Under
the law of parties, a person is criminally responsible for an offense if the
offense is committed by his own conduct, by the conduct of another for which he
is criminally responsible, or by both.  Tex. Penal Code Ann. § 7.01(a) (West 2011);
see Trenor v. State, 333 S.W.3d 799, 806 (Tex. App.—Houston [1st Dist.]
2010, no pet.).  A person is criminally responsible for the
conduct of another if he acts “with intent to promote or assist the commission
of the offense” and he “solicits, encourages, directs, aids, or attempts to aid
the other person to commit the offense.”  Tex.
Penal Code Ann. § 7.02(a)(2) (West 2011); see Trenor, 333 S.W.3d at 806.  When
a party is not the primary actor, the State must prove conduct constituting an
offense plus an act by the defendant done with the intent to promote or assist
such conduct.  Trenor, 333 S.W.3d at 806 (citing Beier v. State, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985); Miller
v. State, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet. ref’d)).  Evidence is sufficient to sustain a conviction
under the law of parties if it shows the defendant was physically present at
the commission of the offense and encouraged the commission of the offense
either by words or by other agreement.  Id. at 806–07 (citing Ransom v. State,
920 S.W.2d 288, 302 (Tex. Crim. App. 1994)).

          “Since
an agreement between parties to act together in a common design can seldom be
proved by words, the State often must rely on the actions of the parties, shown
by direct or circumstantial evidence, to establish an understanding or a common
design to commit the offense.”  Miller, 83 S.W.3d at 314, cited in Leadon v. State, 332 S.W.3d 600, 606 (Tex. App.—Houston [1st
Dist.] 2010, no pet.).  The agreement must
be made before or contemporaneously with the criminal event, but in determining
whether the defendant has participated in an offense, the court may examine the
events occurring before, during, and after the commission of the offense.  Leadon, 332 S.W.3d at 606 (citing Beier, 687 S.W.2d at 3–4; Miller, 83 S.W.3d at 314).  Circumstantial evidence may be sufficient to sustain
a conviction as a party to an offense.  Id. (citing Wygal v. State, 555 S.W.2d 465, 469 (Tex. Crim. App.
1977); Miller, 83 S.W.3d
at 314.

          Mere presence at the scene
is not enough to sustain a conviction; however, that fact may be considered in
determining whether an appellant was a party to the offense.  Id.
(citing Valdez v. State,
623 S.W.2d 317, 321 (Tex. Crim. App. 1979) (op. on reh’g); Miller, 83 S.W.3d at 314.  If the evidence shows the mere presence of the
defendant at the scene of an offense, without more, then it is insufficient to
sustain a conviction as a party to the offense. 
Id. (citing Valdez, 623 S.W.2d at 321; Scott v.
State, 946 S.W.2d 166, 168
(Tex. App.—Austin 1997, pet. ref’d)).

D.      Analysis

          Here,
the basic elements of aggravated robbery are not at issue.  Adams does not contest the sufficiency of the
evidence to show that McFarland and Wesby, acting in the course of committing theft,
and with intent to obtain or maintain control of property, intentionally or
knowingly placed the complainants in fear of imminent bodily injury or death
and used or exhibited a firearm.  See Tex.
Penal Code Ann. §§ 29.02(a), 29.03(a)(2).  Adams challenges only the sufficiency of the
evidence to show that he was a party to the offense.  

          Adams
asserts that the video does not show that he threatened anyone or robbed
anyone.  Adams also points to the fact
that he remained at the scene of the robbery and voluntarily spoke with
police.  Adams argues that he was merely
“a dupe” and had no idea that McFarland and Wesby were using him to gain entry
to the Keno Castle game room.  McFarland,
recognizing Adams and his car, “complemented the prize possession of a mentally
impaired man” to use him as a “tool for entry” into the game room.  Adams contends that he did not knowingly or
intentionally participate in the robbery.

          However,
we must view all the evidence in the light most favorable to the jury’s verdict.  Clayton, 235 S.W.3d at 778.  In
doing so we presume the jury resolved all conflicts in evidence and credibility
determinations in favor of its verdict.  Id.; Gonzalez, 337 S.W.3d at 479.  Viewed in the light most favorable to the
verdict, the evidence shows that Adams picked up McFarland and Wesby two blocks
from the game room.  He drove them to the
game room, where they gained entry by following Adams through the secured back
door after Collins opened it for Adams. 
While Wesby robbed the office, McFarland robbed all of the patrons in
the main room, except for Adams’s friend Robinson, whom they ignored.   Adams
can be seen on the video initially getting on his knees in response to
McFarland’s commands, but then getting back up. 
After McFarland gestured and said something to him, Adams went to
Collins’s desk and removed her purse from one of the drawers.  McFarland grabbed the purse on his way out of
the game room.  McFarland and Wesby used Adams’s
car to return to Thomas’s home, where they abandoned Adams’s car and drove away
in another car that had not been present at the robbery.  Taking this evidence, and all reasonable
inferences from this evidence in support of the verdict, we conclude that a
rational factfinder could determine that Adams intended to promote or assist
the commission of the aggravated robbery and solicited, encouraged, directed,
aided, or attempted to aid McFarland and Wesby to commit the aggravated
robbery.  See Tex. Penal Code Ann.
§ 7.02(a)(2).  The evidence shows
more than Adams’s mere presence at the scene; he drove McFarland and Wesby to
the game room, provided the means for them to enter, and provided the means for
them to return to a second getaway car that was not present at the scene of the
robbery.  See Johnson v. State,
6 S.W.3d 709, 711 (Tex. App.—Houston [1st Dist.] 1999, pet. ref’d) (holding
that evidence was sufficient to support conviction for aggravated robbery under
law of parties where the defendant performed reconnaissance of the robbery
location before the robbery and drove the getaway car); Brewer v. State,
852 S.W.2d 643, 647 (Tex. App.—Dallas 1993, pet. ref’d) (holding that evidence
was sufficient to support conviction for aggravated robbery under the law of
parties where the defendant dropped off his accomplice and picked up the
accomplice shortly after the shooting); Cumpian v. State, 812 S.W.2d 88, 90 (Tex. App.—San
Antonio 1991, no pet.) (holding that evidence was sufficient to support
conviction for burglary of a building under the law of parties where the
defendant appeared to be the “look-out person”).  Accordingly, we hold that the
evidence is legally sufficient to support the jury’s verdict that Adams was
guilty under the law of parties.

          We
overrule Adams’s sole issue. 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Rebeca
Huddle

                                                                   Justice


 

Panel consists of Justices
Higley, Sharp, and Huddle.

Do not publish.   Tex. R. App. P. 47.2(b).